OPINION
{¶ 1} Appellant Joy Rushing, the biological mother of Terry Rushing, born January 12, 1997, and Tressa Rushing, born November 19, 2000, appeals the decision of the Muskingum County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of said minor children to Muskingum County Children Services ("MCCS").[1]
 {¶ 2} The case of In re Terry Rushing, Muskingum County Court of Common Pleas, Juvenile Division Case No. 20530012 was appealed in Court of Appeals Case No. CT06-0030; the case of InRe Tressa Rushing, Muskingum County Court of Common Pleas, Juvenile Division Case No. 20530013 was appealed in Court of Appeals Case No. CT06-0031. The trial court addressed these cases simultaneously, and appellant has set forth identical assignments of error and identical briefs.
 STATEMENT OF THE FACTS AND CASE {¶ 3} Appellant has an extensive history with MCCS that is pertinent to the case sub judice. In 1996, appellant reported that her oldest son, Tommy had set fire to a couch; Tommy was removed from the home and admitted to the psychiatric ward of a local hospital. Later, appellant admitted to having set the fire herself and blaming Tommy in order to have him removed from the home. Between 1996 and 1998 MCCS received multiple referrals regarding physical abuse of Tommy by the appellant, as well as her failure to supervise him. Tommy was removed from appellant's care several times, both voluntarily and involuntarily. During a 1998 psychological evaluation, appellant admitted that she often took her anger out on Tommy, shaking him, smacking him, throwing him into his crib, slapping him in the face, punching him, and on one occasion trying to smother him. Appellant recalled hitting Tommy so hard that his nose bled. Tommy was permanently removed from appellant by the Muskingum County Juvenile Court and placed for adoption by MCCS in 1998. He was eight years old.
 {¶ 4} Appellant's second oldest son, Timmy, was born in 1992, and was also removed from appellant several times. In April of 2000, appellant was pregnant with Tressa, and caring for then four-year old Terry and eight-year old Timmy. Appellant called her MCCS case worker and asked that MCCS take temporary custody of Terry and Timmy. Following a brief stay in the hospital, appellant was released and, in May of 2000, gave Timmy to his father. She later called her case worker and said she had made a mistake and she wanted Timmy back home. Timmy was returned to appellant in June of 2000.
 {¶ 5} In September of 2000, appellant accused Timmy of keeping a butcher knife under his pillow and threatening to kill her and her unborn baby. Timmy denied the allegations. Appellant also told her case worker that some of Timmy's underwear had been shredded, implying that he himself had shredded them. Timmy was placed with his grandmother for approximately one month, was returned to appellant, and was voluntarily placed in foster care in October of 2000. While in foster care, Timmy did not exhibit any of the antisocial behavior of which appellant had accused him. Timmy was returned to appellant in November of 2000, two days before the birth of Tressa. In December of 2000, appellant called her case worker and accused Timmy of smearing feces on the bathroom walls. The case worker, together with appellant's family stability worker, visited appellant's home, inspected the bathroom, and reported that feces was smeared on the walls, the sink and the toilet. In January of 2001, appellant admitted that she and a friend had placed the knife under Timmy's pillow, shredded his underwear, smeared the feces on the walls, sink and toilet, and blamed Timmy for all of the acts.
 {¶ 6} Timmy, Terry and Tressa all remained in appellant's care. For a little over one year appellant was compliant with her case plan, was attending counseling for herself and Timmy, was attending parenting classes, was utilizing protective daycare, and was utilizing extensive community services. In April of 2002, Timmy's counselor observed marks on him; Timmy told his counselor that appellant had become upset with him and used a switch from a tree to hit him on the back. Based upon the counselor's recommendation, the children were placed in foster care. Thirty days later, the children were once again returned to the appellant. The placement did not go well. Timmy reported physical abuse by appellant, and appellant once again accused Timmy of smearing feces in the bathroom. Timmy was removed from appellant, and eventually legal custody of Timmy was granted to his biological father. He was eleven years old.
 {¶ 7} In November of 2004, a referral was made to MCCS regarding appellant's mental health and behavior. The investigator/intake case worker worked with appellant and conducted home visits. When the case worker visited appellant's home on January 11, 2005, she observed that everyone in the home was upset and that tensions were high. Terry was misbehaving. Tressa was at a neighbor's house, and Terry also wanted to go to the neighbor's house. Appellant grabbed Terry by the arm, smacked him on the bottom with her hand, and told him that he "wasn't going f-ing anywhere". Terry ran from the appellant's home, ran around the neighborhood, and refused to listen to anyone. In the meantime, the appellant gave the case worker a handwritten note in which appellant told the case worker that Terry didn't listen to her at all, that he refused to do his homework, and that appellant wanted to "whip his ass so good that he doesn't sit down." Finally, appellant's note advised the case worker to "feel free to take him (Terry) with you". Appellant voluntarily placed Terry in foster care at that time. He was two days shy of his eighth birthday.
 {¶ 8} Tressa, who was four years old at the time, was later removed at a shelter care hearing on January 21, 2005. She was not removed at the same time as Terry, since there were no signs of abuse and appellant's anger and threats were all directed at Terry. Upon reviewing appellant's history with MCCS and her behavioral patterns, MCCS filed a complaint alleging that Terry and Tressa Rushing were dependent children and requesting a disposition of permanent custody of both Terry and Tressa.
 {¶ 9} Two psychologists testified during the permanent custody hearing that took place on February 21 and 22, 2006. One of the psychologists, Dr. Dubbeling, was chosen by the appellant. Dr. Dubbeling testified as follows:
 {¶ 10} "QUESTION: Attorney Tarbert: Ok. And does she have a current diagnosis with the agent, with Six County? {¶ 11}
"ANSWER: Dr. Dubbeling: Yes. My diagnosis for her are depressive disorder NOS, alcohol abuse with sustained full remission, that is a stipulation you do after individuals have been sober for twelve month [sic], you call that sustained full remission. Cannabis abuse with sustained full remission, mild mental retardation and personality disorder NOS.
 {¶ 12} "QUESTION: Attorney Tarbert: And what does, can you give me a summary of your conclusions?
 {¶ 13} "ANSWER: Dr. Dubbeling: Yes. My conclusions I mean, I would like to read them because that's the most precise thing to state to the Court and to use here as evidence, (reading fromhis report) `The purpose of this evaluation is to determine whether Miss Rushing is a fit and appropriate person to have the care and custody of her two minor children, Terry and Tressa. As I mentioned before, my final conclusions are limited by the fact that I never examined the two aforementioned children therefore I cannot make any statements about he [sic] interactions between the children and Miss Rushing. However, within a reasonable degree of psychological certainty, I conclude that Miss Rushing's parenting skills are significantly deficient. The combination of deficient intellectual functioning and poor temper control makes her quite unstable and at that same time, unpredictable as far as parenting is concerned.' Those are my final conclusions." Tr. at pp. 28-29.
 {¶ 14} Dr. Howard Beazel also testified at the permanent custody hearing:
 {¶ 15} "QUESTION: Attorney Tarbert: Ok. You stated in your summary that and I quote from your report that Miss Rushing has a quote `remarkable history of extremely poor judgment which has had a profound impact on her children's lives'. Is that a good summary of what you just told me?
 {¶ 16} "ANSWER: Dr. Beazel: I think so.
 {¶ 17} "QUESTION: Attorney Tarbert: Is this, is Miss Rushing's status chronic?
 {¶ 18} "ANSWER: Dr. Beazel: Yes it is.
 {¶ 19} "QUESTION: Attorney Tarbert: Ok. And is it likely to improve?
 {¶ 20} "ANSWER: Dr. Beazel: No it is not.
 {¶ 21} "QUESTION: Attorney Tarbert: And why is that?
 {¶ 22} "ANSWER: Dr. Beazel: Well she has never shown a higher level of functioning that I'm aware of. I mean she essentially described having experienced a border line existence for most of her life. She, she was never able to describe having been able to show good judgment on anything that approached a consistent manner. She had been involved with Children Services I think since about 1997 or so. She had received as much as many referrals and treatment I think as Children Services could try to get her involved in with nothing more then temporary displays of superficial improvement. She didn't demonstrate any genuine interest in being a good parent to me. I mean, she talked about how she knew that she needed to be more consistent with her daughter that was completely unconvincing and apparently has never been able to do that so the fact that she, that she had never been able to be an adequate parent means that it wasn't as though that something happened and that she was going to return to a baseline of being an adequate parent. Her intellectual functioning is limited and her personality disorder is severe and she's not benefited from any efforts to help her become an adequate parent.
 {¶ 23} "QUESTION: Attorney Tarbert: And this is despite the fact that she's been in counseling pretty consistently since adolescence?
 {¶ 24} "ANSWER: Dr. Beazel: Well despite the fact that's she's been involved in treatment off and on apparent, I believe you know, I've seen no evidence that it's made any difference in her life or in her ability to parent her children.
 {¶ 25} "QUESTION: Attorney Tarbert: Ok. And did, you did not observe Joy interact with the children? With Terry and Tressa?
 {¶ 26} "ANSWER: Dr. Beazel: I admit at this point, I don't recall observing her and I hadn't observed her at the time I wrote the report.
 {¶ 27} "QUESTION: Attorney Tarbert: Ok. And you did not interview the children? Is that correct?
 {¶ 28} "ANSWER: Dr. Beazel: I did not.
 {¶ 29} "QUESTION: Attorney Tarbert: Do you think that any information that you would have gleaned from those interactions would change your opinion and your conclusion?
 {¶ 30} "ANSWER: Dr. Beazel: Well, no and she described her relationship with her children to me. I mean, she essentially said that she started a house fire in order to get rid of one of them. She spoke of being essentially violent with them. She talked to me about throwing one of the children into a play pen or a bed and threw the bottle at him such as she bused [sic] his lip. She spoke to me about not being consistent at all and having a little girl who is essentially behaviorally out of control. I admit this issue came up in a number of discussions that I didn't observe her with the children, and in my opinion it doesn't matter. She sat [sic] a house fire in order to get rid of one of her children. She blamed him for the fire.
 {¶ 31} "QUESTION: Attorney Tarbert: Would the fact that she is, well you saw her approximately one year ago is the date of your evaluation?
 {¶ 32} "ANSWER: Dr. Beazel: Correct.
 {¶ 33} "QUESTION: Attorney Tarbert: And you haven't seen her since?
 {¶ 34} "ANSWER: Dr. Beazel: No.
 {¶ 35} "QUESTION: Attorney Tarbert: Or interviewed her since that time, right?
 {¶ 36} "ANSWER: Dr. Beazel: That's correct.
 {¶ 37} "QUESTION: Attorney Tarbert: Would it change your summary or conclusion to know that she has been substance free and alcohol free for one year?
 {¶ 38} "ANSWER: Dr. Beazel: No." Tr. at pp. 45-48.
 {¶ 39} The appellants' poor impulse control was illustrated during the course of the permanent custody hearing when her attorney began his cross examination of Dr. Beazel;
 {¶ 40} "QUESTION: Judge: All right, Mr. Deitirck [sic]?
 {¶ 41} "STATEMENT: Attorney Deitrick: Thank You. Good morning Doctor Beazel.
 {¶ 42} "STATEMENT: Dr. Beazel: I'm sorry, you said good morning and she made an aggressive motion towards me.
 {¶ 43} "STATEMENT: Attorney Deitrick: I didn't, I didn't observe that.
 {¶ 44} "STATEMENT: Judge: I didn't either. I was writing notes.
 {¶ 45} "ANSWER: Dr. Beazel: Well.
 {¶ 46} "QUESTION: Judge: Do you want the record to reflect what is was?
 {¶ 47} "ANSWER: Dr. Beazel: She, yes. She acted as though she wanted to choke me and made a motion with her hands.
 {¶ 48} "QUESTION: Judge: All right. The record will so reflect.
 {¶ 49} "STATEMENT: Attorney Deitrick: I, I object. I would like to place an objection to that being on the record Your Honor.
 {¶ 50} "QUESTION: Judge: And the objection is?
 {¶ 51} "ANSWER: Attorney Deitrick: I don't know if anybody else observed that or not.
 {¶ 52} "STATEMENT: Judge: All I can say is I didn't. But if that's what Doctor Beazel observed and that's what he's put in the record, if, if at the appropriate time she wants to explain what she was doing and that its [sic] not what he interpreted why, she will be given an opportunity to do that. Tr. at pp. 49-50.
 {¶ 53} In addition to the expert testimony, several caseworkers with whom the appellant had contact testified that, although appellant had availed herself of virtually every service available to her, her ability to parent remains compromised.
 {¶ 54} The appellant did not file a request for findings of fact and conclusions of law. On March 13, 2006, the trial court entered a judgment entry terminating the appellant's parental rights and granting permanent custody of her minor children, Terry and Tressa, to MCCS. The Appellant appealed, setting forth the following assignment of error:
 {¶ 55} "THE TRIAL COURT ERRED WHEN IT DETERMINED THAT PERMANENT CUSTODY OF TERRY RUSHING SHOULD BE GRANTED TO MUSKINGUM COUNTY CHILDREN SERVICES."[2]
 {¶ 56} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment.Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978),54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 57} The trial court concluded that pursuant to Ohio Revised Code Section(s) 2151.414 (B)(1) and (E), the minor children could not be placed with either parent within a reasonable time, and should not be placed with either parent, and that pursuant to Ohio Revised Code Section(s) 2151.414 (B)(1) and (D), it was in the best interest of the minor children that permanent custody be awarded to MCCS.
 {¶ 58} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, and provides in pertinent part:
 {¶ 59} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 60} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, and psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. . . ."
 {¶ 61} R.C. 2151.414(D) states as follows: "In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 62} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 63} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 64} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 65} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 66} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 67} In the case sub judice, testimony was adduced that appellant is simply unable to parent her children. As stated by Dr. Dubbeling, the combination of appellant's deficient intellectual functioning and her poor impulse control, her inability to control her temper in particular, makes her very unstable and unpredictable as far as her parenting is concerned. This condition is chronic, and unlikely to improve. Indeed, the appellant has been availing herself of a multitude of social services for many, many years. Despite her efforts and those of her caseworkers, the appellant continues to exhibit an inability to handle the day to day stresses of being a parent.
 {¶ 68} This conclusion is supported by the Guardian Ad Litem ("GAL") appointed by the court to represent Terry's and Tressa's best interests. In addition to her involvement at the permanent custody hearing, the GAL submitted a report to the court. The GAL report was based upon her review of agency files, including four psychological reports, and meetings with and/or interviews of appellant's various caseworkers, Dr. Beazel, the appellant's pastor, both fathers, the appellant, the children, and the foster parents. In addition, the GAL observed the children during their visitations with their mother at the agency, participated in formulating the appellant's case plan, and attended the appellant's Semi-Annual Review ("SAR"). The GAL noted that the appellant has a long history of mental health issues which resulted in the removal of her two older children prior to the within cases. She also noted that the ages of the older children at the time of their removal were very close, if not the same, as the current ages of Terry and Tressa.
 {¶ 69} The GAL noted in her report that despite the fact that the appellant is highly motivated to participate in numerous services and has in fact done so over many years, "emotional and mental impairments are at such a level that her parenting skills, impulse control and reasoning abilities are so significantly deficient that the children not only cannot be returned to her within a reasonable period of time, they should not be returned to her." The GAL went on to state: "[a]ccording to the experts in this case, Ms. Rushing's condition(s) are chronic. As the children get older and react to her deficiencies, their safety and welfare can no longer be protected as they are the ones `running the show' so to speak." February 23, 2006, Report of Guardian Ad Litem. Based upon her review of the case history, as well as her personal observations and interviews, the GAL opined that it was in the children's best interests to permanently terminate the appellant's parental rights and grant permanent custody to the agency.
 {¶ 70} The trial court conducted a hearing that spanned one and one-half days at which testimony was elicited from thirteen witnesses. The trial court thoroughly considered all of the evidence, as well as the factors set forth in the applicable statutes, and reached the decision that permanent custody of Terry and Tressa should be granted to MCCS.
 {¶ 71} Based upon the foregoing, we find that the trial court's findings, that the children cannot be placed with the appellant within a reasonable time and should not be placed with her and that the grant of permanent custody was in the children's best interest, were not against the manifest weight and sufficiency of the evidence. The appellant's assignment of error is, therefore, overruled. Accordingly, the judgment of the Muskingum County Court of Commons Pleas, Juvenile Division, is affirmed.
By: Edwards, J. Hoffman, P.J. and Boggins, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division, Case Nos. 20530012 and 20530013, is affirmed. Costs assessed to appellant.
[1] The biological father of Terry Rushing is Leslie Myers, and the biological father of Tressa Rushing is Jerry Pitman. Neither Myers nor Pitman have appealed the trial court's decision.
[2] The appellant set forth identical assignments of error in both of her appellate briefs, apparently inadvertently failing to replace the name "Terry Rushing" with the name "Tressa Rushing" in Court of Appeals Case No. CT2006-0031.